900 So.2d 784 (2005)
Cynthia BRIDGES, Secretary, Department of Revenue, State of Louisiana
v.
AUTOZONE PROPERTIES, INC.
No. 2004-C-0814.
Supreme Court of Louisiana.
March 24, 2005.
Opinion Concurring in Denial of Rehearing May 13, 2005.
*786 Weiler & Rees, LLC, Theodore David Vicknair, John Jurgen Weiler, New Orleans, Counsel for Applicant.
Oreck, Bradley, Crighton, Adams & Chase, LLC, Frederick William Bradley, Nicole Crighton, Boulder, CO, Counsel for Respondent.
JOHNSON, Justice.
Autozone, Inc. is a Nevada corporation engaged in the nationwide retail sale of automobile parts. In 1995, the corporation became a holding company which provided management services to its several subsidiaries. All retail stores, including the 68 stores in Louisiana, are now owned by Autozone Development Corporation, a corporate real estate investment trust (REIT).
As a REIT, Autozone Development distributed most of its income to its beneficial owners. The majority of shares were owned by Autozone Properties, Inc., a Nevada corporation organized for the sole purpose of holding shares in Autozone Development.
Following a tax audit, the Louisiana Department of Revenue filed this action against Autozone Properties to recover income taxes on rental income received from the REIT, and franchise taxes on Autozone Properties' taxable capital in Louisiana. The state takes the position that under La. R.S. 47:287.93 the corporate owner of a REIT is required to file a tax return and to report the Louisiana income that passes through it.
The Department argues that rent from Louisiana real estate is income derived from Louisiana sources, and trust beneficiaries, including beneficiaries of the REIT are required to file tax returns reflecting their Louisiana source income. Autozone Properties argues that it is not doing business in the state of Louisiana, and is therefore *787 not subject to personal jurisdiction in Louisiana courts, as it does not meet the definition of "minimum contacts" with this state.
For the reasons that follow, we conclude that Louisiana has personal jurisdiction over a nonresident shareholder when Louisiana has provided benefits, opportunities, and protections which helped to create the income.

FACTS and PROCEDURAL HISTORY
Prior to 1995, Autozone, Inc. operated and paid corporate income taxes as one entity. After corporate restructuring, Autozone, Inc., became a holding company that provided management services to its subsidiary businesses. Three of those subsidiary entities are relevant to our discussion: (1) Autozone Stores, Inc. (hereinafter Stores), (2) Autozone Development Corp., (hereinafter Development), and (3) Autozone Properties, Inc. (hereinafter Properties). Stores and Development are registered with the Louisiana Secretary of State as non-domiciliary business corporations that are domiciled in Nevada and have their principal offices in Tennessee. Both Stores and Development filed Louisiana income tax returns. Conversely, Properties also domiciled in Nevada, with its principal place of business in the Bahamas, is not registered in Louisiana and filed no Louisiana income tax return.
Stores engages in the retail sale of automobile parts. Developmentthe real estate investment trustowns the real property where Stores operates. Development operates as a conduit or pass-thru entity for Properties. Properties holds 100% of the common stock and roughly 90% of the preferred stock in Development.
Stores pays rent to Development in the amount of 8% of the Stores' gross sales for the use of Development's real property, in operating its retail sale business. For the taxable years 1996 through 1998, Stores paid Development approximately $20 million in rent for its Louisiana operations. On its Louisiana income tax returns, Stores took deductions for the rents it paid to Development.
Properties received the rental income, sourced in Louisiana, from Development in the form of dividends. Thus, the rental income that was created from real property located in Louisiana escaped Louisiana taxation. Development's function as a conduit or pass-thru entity is essential for Properties' untaxed receipt of the Louisiana-sourced rental income, in the form of dividends.
During the tax period at issue, Development distributed 100% of its earnings to Properties. On its Louisiana tax return, Development reported no income because it took a dividends-paid deduction for the rental income it passed through to its shareholders, Properties.
The Louisiana Department of Revenue and Taxation (the Department) has not contested Development's right to take the dividends-paid deduction on its Louisiana income tax return. However, the Department has disputed Properties' right to receive the passed through rental income, in the form of dividends, without filing a Louisiana tax return or paying any Louisiana income taxes.
The state filed suit against Properties pursuant to La. R.S. 47:1561(3), which provides authority to collect taxes by ordinary suit, and La. R.S. 13:3201, the Louisiana long-arm statute. In its petition to collect taxes, the state asserts that Properties received income from a REIT located and operating in Louisiana but failed to file a Louisiana tax return. As a result, the state performed a corporation income tax and corporation franchise tax audit of Properties for the taxable years 1996 through 1998 and determined, pursuant *788 to La. R.S. 47:287.92-287.93 and La. Admin. Code title 61 § I.XXXX-XXXXX, that Properties owed back taxes. Therefore, the state imposed a corporation income tax on Properties for the taxable years ending in August 1996 and August 1997 pursuant to La. R.S. 47:287.2 et seq., and a corporation franchise tax against Properties for the taxable years ending in August 1997 and August 1998 pursuant to La. R.S. 47:601 et seq. The state sought to collect the following alleged tax liabilities:
(1) corporation income taxes of $778,789.00 plus interest of $519,710.40 plus a delinquent penalty of $194,697.25 plus interest and penalties until paid;
(2) corporation franchise taxes in the amount of $214,098.00 plus interest of $141,704.55 plus a delinquent penalty for $53,524.50 plus interest and penalties until paid.
According to the state's petition, Properties was given sufficient notice of the tax assessment. The state then brought suit against Properties to recover $1,902,523.70 in taxes. In response to the suit, Properties filed an exception of lack of personal jurisdiction which argued that Louisiana was without jurisdiction to tax Properties because Properties lacked a "substantial nexus" or "significant contacts" with the state. Specifically, Properties made the following four arguments: (1) a nonresident shareholder of a corporation doing business in Louisiana does not thereby subject itself to the jurisdiction of a Louisiana court, (2) the situs of Properties shares in Development follows the commercial domicile of Properties, (3) jurisdiction over Properties cannot be established in light of the restrictions imposed by the Due Process Clause of the 14th Amendment, and (4) jurisdiction over Properties cannot be established in light of the restrictions imposed by the United States commerce clause. U.S. Const. Art. 1, § 8, cl. 3.
The trial court sustained Properties' exception of lack of personal jurisdiction but also noted that the reorganized structure amounted to a "scheme" initiated by Autozone in an effort to maximize their profits and reduce taxes.
In its analysis, the court relied on the seminal case International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) for the legal concept of "minimum contacts." In International Shoe, supra, the United States supreme court held the following:
due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.' Id. at 316, 66 S.Ct. 154.
Without reaching a conclusion on this issue of whether Properties had enough "minimum contacts" with Louisiana to justify Louisiana's imposition of taxes, the trial court ruled that the real question was whether Louisiana ought to subject Properties to its jurisdiction based on an "entity isolation theory" that the parties had cited in brief.
The trial court discussed Brunswick Corp. v. Suzuki Motor Co., Ltd., 575 F.Supp. 1412 (E.D.Wis.1983) and Scripto, Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960) and concluded the "entity isolation theory" was inapplicable. Brunswick, supra, involved a manufactured product that made its way into the stream of commerce. Scripto, supra, involved a product that was sold by agents. Both cases involved products. Conversely, the court ruled that in the present case there was no product at issue. Thus, the *789 court reasoned that the entity isolation theory was inapplicable here because no product was involved.
The trial court then moved on to consider the ultimate question which was whether or not persons who receive distributions from REITs should pay taxes to the state where the REIT is located or whether taxes should be paid to the state where the recipient is domiciled. The court concluded that Properties lacked the requisite "minimum contacts" to bring it under Louisiana's taxing authority and sustained Properties' exception of lack of personal jurisdiction.

Court of Appeal
On appeal, the First Circuit concluded that the dividends received by Properties from its ownership of Development shares did not acquire a business situs in Louisiana and affirmed the trial court's ruling sustaining Properties' declinatory exception of lack of personal jurisdiction. Bridges v. Autozone Properties, Inc., XXXX-XXXX (La.App. 1st Cir.01/05/2004), 873 So.2d 25, rehearing denied (02/27/2004).
The court of appeal distinguished the facts before it from Geoffrey, Inc. v. South Carolina Tax Commission, 313 S.C. 15, 437 S.E.2d 13, (1993) cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (Nov. 29, 1993), the leading case on states' taxing jurisdiction over nonresidents based on the nonresidents' intangible property. The court reasoned that under Louisiana law, "the Development shares owned by Properties, as well as the dividends received by Properties from these shares, are not present in Louisiana." Bridges, supra, at 29-30. Thus, unlike Geoffrey, supra, where the subject entity's intangible property was located in the forum state, here, Properties' intangible propertyshares and dividend incomewas located outside of Louisiana, according to the court of appeal.
Citing United Gas Corp. v. Fontenot, 241 La. 488, 129 So.2d 748, 752, 758 (1961) and United Gas Corp. v. Fontenot, 241 La. 564, 129 So.2d 776, 778-779 (1961), the court determined that Louisiana applied three separate and distinct doctrines to the taxation of intangible property. Bridges, supra. at 30. The three doctrines are as follows:
(1) Intangibles are taxable at the legal domicile of the owner on the basis of the mobilia maxim, which, in the case of a corporation, is the state of incorporation.
(2) If the intangibles are used in another state in such a way as to become an integral part of a business carried on within the foreign state, that state may tax such intangibles on the basis of a "business situs" acquired there.
(3) Where the business of a corporation is so localized as to commercial practices as to be actually managed and functioning in a state other than the state of incorporation (which is to it but a `paper' domicile as distinguished from a real domicile), though its activities reach into two or more states, there may be, for tax purposes, a `commercial domicile' sufficient to permit the state where the corporation has its chief place of business, and where the management functions are exercised, to tax all of the intangibles of the corporation. United Gas Corp., 129 So.2d at 758.
The court of appeal applied these principles to the facts before it and concluded that Louisiana was without jurisdiction to tax the income Properties received from Development. The court held the following:
(W)e conclude the dividends received by Properties from its ownership of Development shares have not acquired a business situs in Louisiana. They were not acquired by Properties in the course of *790 any business conducted in Louisiana. There is no indication that any physical evidence of the share ownership or receipt of dividends has ever occurred in Louisiana. No accounting records of the dividends have been kept in Louisiana. Properties plays no part in the decision-making process of Development with respect to the payment of dividends. Thus, the ownership and control of the shares remained in Properties, and there has been a complete lack of localization or integration of the dividends within Louisiana, which legally is of the essence of "business situs" for purposes of taxation. (Citations omitted) Bridges, supra. at 30.
Similarly, the court determined that Properties' commercial domicile was outside of Louisiana. Id. at 30. In support of its conclusion, the court outlined where Properties is located, where it conducts its business and holds its corporate meetings, who it employs, and where it is qualified to do business. The court opined as follows:
(I)t is clear that Properties's commercial domicile is not in Louisiana, because it is a Nevada corporation, and its principal place of business is located in Nassau, The Bahamas, where all of its activities take place and are managed. A Bahamian employee, who is also a member of Properties's board of directors, is employed at the corporate office to maintain the company's books and records. The remaining members of Properties's board are employees of AutoZone, Inc., the Autozone corporation that employs all AutoZone employees. Annual meetings of Properties's board of directors are held at the corporate office. All minutes of meetings and financial documents are filed in the corporate office in The Bahamas.
Further, Properties is not qualified to do business in Louisiana and conducts no business activities here. It owns no property in Louisiana, has no office nor employees in Louisiana, and has never solicited business from or contracted with Louisiana residents. None of Properties's officers nor directors reside or work in Louisiana, and no business meetings have been held here. (Citations omitted) Id. at 31.
The court, in a footnote, rejected the "alter ego" theory as a means of exercising jurisdiction over Properties. Id. at 31, n. 10. The court noted that the "alter ego" theory has been applied by some courts where a non-resident parent corporation controls a local subsidiary's operations. Id. Here, the court concluded that Properties exercised no control over Development's Louisiana operations. Id.
The court cited Kevin Assoc., L.L.C. v. Crawford, 01-26552 (La.App. 1st Cir.11/8/02), 834 So.2d 465, 469, writ granted, 03-0211 (La.4/21/03), 847 So.2d 1177, for the proposition that a non-resident parent company is not subject to Louisiana's jurisdiction merely because its subsidiary operates in the state. Bridges, supra, at 31, n. 10. The court also referenced North Baton Rouge Dev. Co., Inc. v. Collector of Rev., 304 So.2d 293, 298 (La.1974) for the precept that a company holding securities is not doing business in the state by virtue of the dividend income it receives from those securities. Id.
The court's determinations in this case were that (1) many nationwide corporations have used corporate structures similar to Autozone, (2) it was legal for Autozone to structure its organization in such a way as to minimize its tax liability, (3) Autozone has "contrived" a legal way to pay less than their fair share of taxes, and (4) the state's remedy in this case is a legislative one. Id. at 29, 31, n. 11.
*791 In the state's application for rehearing, the attorneys notified the appellate court that this court had reversed Kevin Assoc., L.L.C., supra, and held that the non-resident parent corporation had its commercial domicile in Louisiana and was therefore, subject to Louisiana's tax jurisdiction. Bridges, supra, at 32. In denying the rehearing, the court distinguished the facts in the present case from Kevin Assoc., L.L.C., supra, concluding that in Kevin Assoc., L.L.C., supra, the parent corporation had a much more pervasive presence in Louisiana. Bridges, supra, at 32.
In its writ application to this court, the state argues that the lower courts have sanctioned a tax abuse strategy that will have a far-reaching, negative impact on the state's economy since this and other similar tax schemes are robbing the state of 42% of its corporate income base. The state asserts four main arguments.
First, the state contends that the court of appeal erred in classifying Properties as a corporation rather than as a trust for tax purposes under Louisiana law. Second, the state argues that untaxed income is subject to the jurisdiction of the state from which the income originates, in accordance with federal jurisprudence. Third, the state asserts that the court of appeal erred in its application of the "alter ego" theory. Lastly, the state argues that it is entitled to attorney's fees for its pursuit of this claim pursuant to Louisiana law.

LAW and ANALYSIS
Under the United States Constitution, a state may only tax that part of a corporation's income that has a nexus with the taxing state. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 436-437, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980). However, it is often difficult, if not impossible, for a state to determine with precision the amount of in-state income generated by a multistate business entity. Container Corp. of America v. Franchise Tx. Bd., 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). Recognizing these difficulties, the United States Supreme Court has held that the Constitution imposes no single formula on the states for determining the corporate tax liability of multistate businesses. Id. at 164, 103 S.Ct. 2933, citing Wisconsin v. J.C. Penney, Co., 311 U.S. 435, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940).
Allocation, apportionment, and separate accounting are three methods that states employ for attributing a corporate taxpayer's income to the various states in which it is taxable. Richard D. Pomp and Oliver Oldman, "State Corporate Taxes" in State and Local Taxation, 10-7 (4th ed.2001). Allocation and apportionment operate in tandem. Under the allocation method, a corporation's income is attributed to the states that are considered to be the source of the income. Under the apportionment method, the taxing state considers the income generated by all of the corporation's activities, out-of-state as well as in-state, and then apportions a share of such income to the taxing state by means of a formula that compares the taxpayer's in-state activities to all of its relevant activities. Walter Hellerstein, State Taxation of Corporate Income from Intangibles: Allied Signal and Beyond, 48 TAX.L.REV. 739, 745.
Louisiana's corporate income tax structure uses both allocable and apportionable income methods. La. R.S. 47:287.92(A) provides that "(a)ll items of gross income, not otherwise exempt, shall be segregated into two general classes designated as allocable income and apportionable income." Regarding the apportionable method, in Mobil Oil, supra, the *792 United States Supreme Court held that the "linchpin of apportionability in the field of state income taxation is the unitary-business principle[1]." Id. at 439, 100 S.Ct. 1223.
As stated above, Louisiana uses the apportionment method in its corporate tax system. However, in the case of a group of affiliated companies, Louisiana applies the apportionment method to each separate entity rather than to the related businesses as a whole. Under this separate accounting method, the taxpayer's in-state income is determined as if the taxpayer were carrying on a singular business within Louisiana's borders. As a result, each part of an affiliated group of corporations is treated as a separate entity, and no part of the group is liable for Louisiana corporate income tax unless that specific entity has sufficient nexus with Louisiana.
The separate report used in Louisiana is distinguished from the state combined report utilized in other states that recognizes the unitary business principle for tax purposes.[2]
*793 Under Louisiana's separate reporting system, the amount of corporate income taxes that an affiliated group of corporations pays to Louisiana depends on the organizational structure of the corporate group, rather than the substance of the business activities as a whole. McIntyre, Mines & Pomp, supra, at 702, 703. Furthermore, Louisiana's current separate reporting system has been described as being subject to abuse through commonly known tax-planning techniques. Id. at 700. Legal commentators advocating for the use of a combined, rather than separate, accounting method in Louisiana stated the following:
A multistate group . . . is currently able to reduce its Louisiana apportionable income, and hence its Louisiana income taxes, by isolating highly profitable parts of its unitary business in a corporation that is not taxable in Louisiana. Id. at 703-704.
We have a similar situation before us.
There has been a dramatic growth in the use of pass-thru entities[3] by large, *794 multistate businesses in recent years. Prentiss Wilson, Jr. and Mark Windfeld-Hansen, State Taxation of Pass-Through Entities: General Principles, 419 PLI/TAX 1091 (1998). Generally, when we refer to a corporation we are referring to a traditional C corporation. For federal tax purposes, income earned by a C corporation and distributed as a dividend to its shareholders is taxed twice: once at the corporate entity level and then again at the shareholder level. What differentiates a pass-through entity from a C corporation, and its major tax advantage, is that income earned by a pass-thru entity is not taxed by the federal government at the corporate level. Income passes through the business entity to the owners who are taxed. Thus, the pass-thru entity is attractive to multistate corporations that seek to avoid double taxation at the federal level. Wilson and Windfeld-Hansen, supra, at 1103.
Unfortunately, states have failed to give sufficient attention to pass-thru entities despite their growing popularity and instead focus on taxing individuals and C corporations, to the detriment of states' corporate tax bases. A July 15, 2003 report by the Multistate Tax Commission indicates that state corporate income taxes declined by 34 percent from 1980 to 2001. Part of this decline was due to tax sheltering. The report states as follows:
The lost revenue attributable to domestic and international income tax sheltering is adding to the size of budget deficits while undermining the equity and integrity of state tax systems. It is not enough to say that state corporate taxes are declining just because of federal tax law changes or state tax-cutting during the 1990s. It is apparent that various corporations are increasingly taking advantage of structural weaknesses and loopholes in the state corporate tax systems. Multistate Tax Commission, Executive Summary in Corporate Tax Sheltering and The Impact on State Corporate Income Tax Revenue Collections, (July 15, 2003).
This economic reality for Louisiana and many other states supports an earlier pronouncement made by legal commentators Wilson and Windfeld-Hansen who, in 1998, suggested a comprehensive treatment of state taxes and pass-thru entities. According to Wilson and Windfeld-Hansen,
(b)ecause most state tax laws have failed to keep pace with the sophistication of tax practitioners, and because of the inconsistency in the states' rules, it is often possible to structure transactions in ways which minimize or avoid state taxes without sacrificing the business or federal tax objectives of the parties . . . although it is often difficult to obtain much comfort regarding the intended state tax consequences of a transaction, it is also often possible to manipulate the state tax laws to obtain tax benefits that would be unavailable under better developed and more consistent rules. Wilson and Windfeld-Hansen, supra, at 1104.
*795 There are many distinguishing features among the various types of pass-thru entities. Furthermore, states employ different methods in taxing pass-thru entities and their recipients. See, generally, Wilson and Windfeld-Hansen, supra. However, the common thread for tax purposes, is that income is passed through to the entity's owners who are taxed as opposed to the entity itself. In the present case, this pass through was accomplished through Development, a REIT.
A REIT is a corporation, trust, or association, that operates like a mutual fund, except that REITs own real estate and mortgages, as opposed to stocks, bonds, and other securities. REITs generally focus on a particular real estate sector, i.e. malls and shopping centers, retail and apartment properties, office buildings, health care facilities, etc. The REIT had its origins in mid-nineteenth century Massachusetts as a business trust. Massachusetts law, which largely prohibited corporate ownership of real estate, resulted in the formation and widespread use of business trusts as an instrument for real estate investment by corporations. Note, The Real Estate Investment Trust in Multistate Activity, 48 VA.L.REV. 1105 (1962). However, the United States Supreme court decision in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935) which held that a business trust should be taxed as a corporation, brought about a significant decline in the use of the business trust. This changed with the passage of the Real Estate Investment Trust Act of 1960.
Congress' stated objective in creating the REIT was to extend the "same type of tax treatment to real estate investment trusts specializing in investments in real estate equities and mortgages" as is already accorded to stock and security holdings of regulated investment companies. Marvin S. Kahn, Taxation of Real Estate Investment Trusts, 48 VA.L.REV. 1010, 1013. As a result, REIT beneficiaries would be taxed in substantially the same manner as if they had held the real estate equities and mortgages directly. Id.[4]
There are three types of REITS: (1) Equity REITs  REITs that primarily own, or have interest in income-producing real estate, (2) Mortgage REITs  REITs that originate or acquire mortgage loans and other debt obligations that are secured by real property, and (3) Hybrid REITs  REITs that both own commercial real estate and hold mortgages secured by commercial real estate, a combination of the Equity and Mortgage REIT. William A. Kelley, Jr., Real Estate Investement Trusts Handbook, 8-11 (2d ed.1998). REITs were given a boost by the Tax *796 Reform Act of 1986 which permitted REITs to not only own, but also to operate and manage, income-producing commercial properties.
REITs operate under numerous organizational, income, ownership, asset, and distribution requirements that are outlined in 26 USC § 856-860. Additionally, REITs that operate in Louisiana must satisfy the requirements of the Real Estate Investment Trusts Act, La. R.S. 12:491, et seq. Specific to our discussion here, is the distribution requirement that mandates that a REIT distribute at least 90% of its earnings to its shareholders or beneficiaries. See, 26 USC § 857.
If a REIT meets the statutory requirements, it will not be subjected to federal tax on any of the income it distributes to its shareholders during the taxable year.

TRUST or CORPORATION
The first issue for our consideration is whether Development, a REIT domiciled in Nevada but owning real property in Louisiana and other states, is a trust or a corporation under Louisiana law.
The requirements and characteristics of Louisiana trusts are found in Louisiana's Trust Code. Pursuant to La. R.S. 9:1724, Louisiana's Trust Code is to be interpreted as follows:
The provisions of this Code shall be accorded a liberal construction in favor of freedom of disposition. Whenever this Code is silent, resort shall be had to the Civil Code or other laws, but neither the Civil Code nor any other law shall be invoked to defeat a disposition sanctioned expressly or impliedly by this Code.
With that precept in mind, we now turn to the specific characteristics and requirements of a Louisiana trust. A trust is the relationship resulting from the transfer of title to property to a person to be administered by him as a fiduciary for the benefit of another. La. R.S. 9:1731. Property susceptible of private ownership, and any interest in such property may be transferred in trust. A trust instrument is the written document creating the trust and all amendments and modifications thereof. La. R.S. 9:1725(8). The settlor, trustee, and beneficiary are the essential persons in the creation and maintenance of a trust.[5]
The purpose of the trust is the administration of property for the sole benefit of the beneficiary. Succession of Simpson, 311 So.2d 67 (La.App. 2nd Cir.04/04/1975) writ denied 313 So.2d 839 (La.06/20/1975). Under Louisiana law, title to the trust property vests in the trustee alone, and a beneficiary has no title to or ownership interest in trust property, *797 but only a civilian "personal right" vis-a-vis the trustee, to claim whatever interest in the trust relationship the settlor has chosen to bestow. Read v. U.S. ex rel. Dept. of Treasury, 97-30847, 169 F.3d 243 (C.A. 5th Cir.03/09/1999). The major requirements and characteristics of Louisiana corporations are found in La. R.S. 12:1, et. seq., Louisiana's Business Corporation Law. One or more natural or artificial persons capable of contracting may form a corporation. La. R.S. 12:21. A corporation may be formed for any lawful business purposes, except banking and insurance underwriting in all of their several forms, operating homesteads or building and loan associations, and except (unless the corporation conforms to the provisions of Chapter 8 of Louisiana's Business Corporation Law) practicing law; and laws, or as may be prohibited to corporations by law. La. R.S. 12:22.[6]
Conceptually, a corporation is a separate entity having an existence separate and distinct from its owners. Krivo Industrial Supply Co., v. National Distillers and Chemical Corp., 483 F.2d 1098, 1102 (C.A. 5th Cir.08/07/1973). This characteristic of a separate entity allows a corporation's shareholders to limit their personal liability to their amount of investment. Id. In fact, an individual may form a corporation for the sole or primary purpose of avoiding personal liability. Camp v. Gibbs, 331 So.2d 517 (La.App. 2nd Cir.1976).
In 1960, when REITs were authorized by Congress, a REIT had to be organized as an "unincorporated trust or an unincorporated association" in order to receive favorable tax treatment. See, Kahn, supra, at 1016 (1962). Corporations were specifically excluded from being treated as REITS. Id.
In 1962, the Louisiana legislature authorized REITs. The original statute-which amended Chapter 4 of Title 12 of the Louisiana Revised Statutes of 1950 by adding Part V, relative to real estate investment trusts-provided, in pertinent part, as follows:
A real estate investment trust is an unincorporated business association . . . the holders of which certificates are entitled to the same limitation of personal liability extended to stockholders of private corporations, recognized as real estate investment trust by the Internal Revenue Code of 1954, as amended. Acts 1962, No. 330 § 1.
The statute was renumbered in 1968. In 1970, the Louisiana Legislature amended the statute so that the introductory language to La. R.S. 12:491(B) was changed from "A real estate investment trust is an unincorporated business association. . ." to "A real estate investment trust is a trust . . ."
The Tax Reform Act of 1975 amended 26 U.S.C. § 856, the pertinent Internal Revenue Code provision that defines REITs. Under the Act, REITS were now permitted to operate as corporations. The congressional committee that recommended the changes cited the following reasons for its proposal:

*798 Under present law, a real estate investment trust must be an unincorporated trust or unincorporated association. The committee understands that this requirement has caused operating problems for some REITS under State law. Consequently, the committee amendment adopts the rule in the House bill which provides that REITS are to be permitted to operate in corporate form. However, the committee's amendment makes clear that banks and insurance companies, which typically are engaged in other nonpassive activities, cannot qualify as REITs under these provisions. Pub.L. 94-455, 1976 U.S.C.C.A.N. 3902.
In 1977, the Louisiana Legislature amended La. R.S. 12:491(B). The language at the end of the subsection which read "the holders of which certificates are entitled to the same limitation of personal liability extended to stockholders of private corporations, recognized as a real estate investment trust by the Internal Revenue Code of 1954, as amended," was changed to the current language.
Therefore, at the time of this suit, the applicable Louisiana and federal rules defining REITs provided, in pertinent part, as follows:
La. R.S. 12:491(B).
A real estate investment trust is a trust created at law by an instrument under which property is held and managed by trustees for the benefit and profit of such persons as may be or may become the holders of transferable certificates evidencing beneficial interests in the trust estate, which has elected to qualify for taxation as a real estate investment trust under Part II, Subchapter M of the Internal Revenue Code of 1954, as amended. (Emphasis added). Int. Rev.Code of 1954, 26 USCA 856(a), as amended.
For purposes of this title, the term "real estate investment trust" means a corporation, trust or association
(1) which is managed by one or more trustees or directors;
(2) the beneficial ownership of which is evidenced by transferable shares, or by transferable certificates of beneficial interest.
The state argues that Development is a trust pursuant to La. R.S. 12:491(B). The state cites the beginning language of the subsection which provides that "A real estate investment trust is a trust" and concludes that this language is clear and conclusive. According to the state, Development has elected to qualify for REIT status pursuant to the Internal Revenue Code and therefore must be treated as a trust under Louisiana law. The state asserts that the court of appeal ignored the clear language of La. R.S. 12:491(B) that Development, a REIT, is a trust that holds property for its beneficiary, Properties.
Next, the state contends that Properties, as the corporate beneficiary of a Louisiana trust, is required to file a Louisiana tax return. The state relies on La. R.S. 47:287.93(A)(7) which provides the following:
A. Allocation of items of gross allocable income. Items of gross allocable income or loss shall be allocated to the state where such property is located at the time the income is derived.
(7) For purposes of this Part only, estates, trusts, and partnerships having a corporation as a member or beneficiary shall compute, allocate, and apportion their income or loss within and without this state in accordance with the processes and formulas prescribed by this Part, and the share of any corporation member or beneficiary in the net income *799 or loss from sources in this state so computed shall be allocated to this state in the return of such corporation.
Additionally, the state claims that St. Charles Land Trust v. J.O. St. Amant, 253 La. 243, 217 So.2d 385 (1969) is controlling on this issue. St. Charles Land Trust involved a non-resident beneficiary of a trust that owned real property in Louisiana. Following the non-resident beneficiary's death, the decedent's estate argued that Louisiana was without jurisdiction to extract inheritance taxes on the decedent's interest in the trust. This court disagreed and held that the interest in the trust amounted to "an incorporeal immovable for Louisiana inheritance tax purposes." Id. at 258, 217 So.2d 385. Louisiana had jurisdiction over the non-resident decedent's interest income in the trust because "the inheritance of a non-resident's immovable property, tangible or intangible, situated in this state is taxable." Id. at 251, 217 So.2d 385.
Properties disagrees with the state's reasoning. Properties argues that Development is a REIT organized as a corporation, not a trust, that is domiciled in Nevada. According to Properties, the state is without authority to convert Development's juridical status to suit its purposes in the present matter. Properties asserts that trusts and corporations are distinct juridical persons with different rights and obligations that are governed by laws specific to each entity.
Specifically, Properties contends that the beginning language of 12:491(B) relied on by the state merely recognizes that a real estate investment trust can be created and organized in Louisiana for the purpose of doing business, not that other entities that elect to be taxed as a REIT are converted to a trust. Thus, Properties claims that it is erroneous to bring Development, a REIT organized as a corporation and recognized as such under the Internal Revenue Code, under Louisiana's laws applicable to trusts, as the state suggests. We agree.
The starting point for the interpretation of any statute is the language of the law itself. Gregor v. Argenot Great Central Insurance Co., XXXX-XXXX (La.05/20/2003) 851 So.2d 959, 964, rehearing denied 09/05/2003. When the Supreme Court interprets a statute, it is bound to give effect to all parts of it and cannot give it an interpretation that makes any part of it superfluous or meaningless, if that result can be avoided. Id. at 965. The meaning and the intent of a law is determined by a consideration of the law in its entirety and all other laws on the same subject matter, and the court's construction should be placed on the provision in question which is consistent with the express terms of law and with the obvious intent of the lawmaker in enacting it. Stogner v. Stogner, XXXX-XXXX (La.07/07/99) 739 So.2d 762.
The state limits its analysis of the applicable statute, La. R.S. 12:491(B), to the beginning part of the subsection and to those words within the statute that refer to the characteristics of a trust. However, the ending phrase of the statute that references the Internal Revenue Code indicates that the Legislature intends for REITS doing business in Louisiana to have the benefits and the burdens afforded by the federal statute.
The organizational, income, and asset requirements for REITs are outlined by the Internal Revenue Code, not by Louisiana law. A REIT must be a corporation, trust or association. 26 USC § 856(a)(1). It must be managed by one or more trustees or directors. 26 USC § 856(a)(1). The beneficial ownership of REITS must be evidence by transferable certificates. *800 26 USC § 856(a)(2). REITs must be the type of entity that would normally be taxable as a domestic corporation but for the REIT provisions of the Code. 26 USC § 856(a)(3). The beneficial ownership of REITs must be held by 100 or more persons. 26 USC § 856(a)(5). REITs must distribute at least 90% of its net annual taxable income to its owners. 26 USC § 857. These requirements are mandated by the Internal Revenue Code. In fact, it is the Internal Revenue Service that qualifies an entity as a REIT, not the state.
Louisiana has requirements that REITS must meet in order to do business in the state. For example, La. R.S. 12:492 requires that any REIT desiring to do business in Louisiana "shall file with the secretary of state a verified copy of the trust instrument creating such a trust and any amendment thereto, the assumed business name, if any, and the names and addresses of the trustees." However, the initial certification as a REIT is a federal determination. The implication of Louisiana's statutory requirements is that the REIT is already in existence when it seeks authorization from Louisiana's secretary of state to do business in Louisiana. Since the organizational, income and asset requirements imposed on REITs seeking to do business in Louisiana, and any other state, are found in the Internal Revenue Code, by analogy, it is logical to conclude that the organizational structures allowed by the Internal Revenue Code for REITs are applicable to REITs doing business in Louisiana. In other words, if REITs that wish to operate in Louisiana have the burdens of federal statutory requirements then they should also have the benefits.
As noted above, 26 U.S.C. § 856(a), as amended, provides REITs with the option of organizing as a trust, corporation, or association. Development chose to organize as a corporation domiciled in Nevada. Development's status as a corporation remains intact and is not converted to a trust simply by its business operations in Louisiana.

TAX JURISDICTION
The second issue before the court is whether Louisiana has taxing jurisdiction over the dividend income of a nonresident beneficiary, Autozone Properties, based on its investment in Autozone Development which receives the benefits, opportunities, and protections that come from doing business in Louisiana. While this issue is res nova in this court, it has been considered by the First Circuit Court of Appeal in Secretary, Department of Revenue, State of Louisiana v. Gap, XXXX-XXXX (La.App. 1st Cir.06/25/2004), 886 So.2d 459.[7]
A state's jurisdiction to tax a non-resident corporation is bound by the nexus requirements of the Due Process Clause of the 14th Amendment, U.S.C. Const. Amend. 14, and the United States Commerce Clause, U.S.C. Const. Art. 1, § 8, cl. 3. Container Corp. v. Franchise Tax Bd., supra, at 164, 103 S.Ct. 2933. The United States Supreme Court detailed the differences between the Due Process Clause and the Commerce Clause in Quill v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91.
The constitutional requirements for the Due Process Clause differ in fundamental ways from the Commerce Clause. Quill, supra, at 305, 112 S.Ct. 1904. The Due Process Clause requires *801 some definite link, some minimum connection between a state and the person, property or transaction it seeks to tax, and the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State Id. at 306, 112 S.Ct. 1904. Citing International Shoe, supra, the court has framed the Due Process inquiry as whether a defendant had minimum contacts with the jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Id. at 307, 112 S.Ct. 1904. When deciding Due Process issues, the court has abandoned more formalistic tests that focused on a defendant's "presence" within a state in favor of a more flexible inquiry into whether a defendant's contacts with the forum made it reasonable, in the context of our federal system of government, to require it to defend a suit in that state. Id. at 307, 112 S.Ct. 1904. Under these principles, if a nonresident corporation purposefully avails itself of the benefits of an economic market in the forum state, it may subject itself to the state's in personam jurisdiction even if it has no physical presence in the state. Id. at 307, 112 S.Ct. 1904. Conversely, citing Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Quill court held that it will sustain a tax against a Commerce Clause challenge so long as it meets the following four-part test: the tax is (1) applied to an activity with a substantial nexus with the taxing State, (2) fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. Quill, supra, at 311, 112 S.Ct. 1904.
We note that the Commerce Clause issue has not been raised on appeal in this case. Bridges v. Autozone Properties, XXXX-XXXX (La.App. 1st Cir.1/5/04), 873 So.2d 25, 28 n. 2. Since the parties did not argue this issue in brief, we will treat the issue as abandoned. Boudreaux v. State of Louisiana, DOTD, XXXX-XXXX (La.2/26/02), 815 So.2d 7. Thus, our singular focus is the Due Process Clause of the 14th Amendment.
In 1987, the Louisiana Legislature amended its long-arm statute and added subsection (B) which provides as follows:
In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States. La. R.S. 13:3201, subd. B.
As a result, the limits of Louisiana's long-arm statute became coextensive with the limits of constitutional Due Process. Superior Supply Company v. Associated Pipe and Supply Company, 515 So.2d 790, 792 (La.1987). Therefore, the inquiry regarding Louisiana's jurisdiction over a non-resident is an analysis of the constitutional Due Process requirements. Id. at 792. If the assertion of jurisdiction satisfies the constitutional Due Process requirements then the assertion of jurisdiction satisfies Louisiana's long-arm statute. Id.
The United States Supreme Court long-ago settled that states have jurisdiction to tax the income of a nonresident when the income is created within the state's borders. Generally, the Court has tied the state's taxing power to the benefits, opportunities, and protections provided by the state.[8] *802 *803
*804 The United States Supreme Court decided International Harvester Co. v. Wisconsin Dept. Of Taxation, et al., 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944) and upheld the constitutional right of the state of Wisconsin to tax the dividend income distributed to nonresident shareholders, although the dividend income was declared and distributed outside of Wisconsin. The case involved International Harvester, a New Jersey corporation, and Minnesota Mining Company, a Delaware corporation, which were both doing business in Wisconsin. Their shareholder dividends were declared outside of Wisconsin and drawn on out-of-state banks. Nonetheless, the Wisconsin Department of Taxation assessed both corporations taxes on the income the corporations earned in Wisconsin and subsequently paid out in dividends. The Wisconsin Supreme Court affirmed the Department's tax assessment.
On appeal to the United States Supreme Court, the corporations argued that Wisconsin was without jurisdiction to tax the dividend income because the dividends were declared out of state and the nonresident shareholders received the dividends outside of Wisconsin. Therefore, the corporations asserted that the imposition of taxes by Wisconsin violated the due process rights of the stockholders since all of the dividend-payment activity occurred outside of Wisconsin. The court disagreed with this reasoning and expressly determined that the tax liability was assessed against the shareholder rather than the corporation, even though the dividend tax was withheld by the corporation. The court ruled that, "(f)or present purposes we assume that the statute, by directing deduction of the tax from declared dividends, distributes the tax burden among the *805 stockholders differently than if the corporation had merely paid the tax from its treasury and that the tax is thus, in point of substance, laid upon and paid by the stockholders." Id. at 440, 64 S.Ct. 1060. Moreover, the court held that there was no
constitutional obstacle either to the state's distributing the burden of the tax ratably among the stockholders, as the ultimate beneficiaries of the corporation's activities within the state ... or to the state's imposing on the corporation the duty of acting as its agent for the collection of the tax, by requiring deduction of the tax from earnings distributed as dividends. Id. at 441, 64 S.Ct. 1060.
Second, the court affirmed the state's power to assess taxes against income created within the state's borders based upon the benefits, opportunities, and protections it provides. Additionally, the court expressed the view that the nonresident shareholder's presence within the taxing state was not a requirement. The court held as follows:
Wisconsin may impose the burden of the tax either upon the corporation or upon the stockholders who derive the ultimate benefit from the corporation's Wisconsin activities. Personal presence within the state of the stockholder-taxpayers is not essential to the constitutional levy of a tax taken out of so much of the corporation's Wisconsin earnings as is distributed to them. A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers . . . And the privilege of receiving dividends derived from corporate activities within the state can have no greater immunity than the privilege of receiving any other income from sources located there. Id. at 444-442, 64 S.Ct. 1060.
Several state courts have embraced the reasoning of International Harvester regarding the state's taxing jurisdiction based upon the municipal privileges the state provides. The South Carolina court in Geoffrey, supra, cited International Harvester for the proposition that "a state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are within the protection of the state and entitled to the numerous other benefits which it confers." Geoffrey, 313 S.C. at 23, 437 S.E.2d 13.
Geoffrey, Inc. v. South Carolina Tax Commission, 313 S.C. 15, 437 S.E.2d 13, is the leading case among states that have asserted their tax jurisdiction over non-resident entities without a physical presence in the state. Geoffrey, supra, involved a trademark holding company, Geoffrey, Inc., (hereinafter "Geoffrey") that was domiciled and principally operated in Delaware. In 1984, Geoffrey became the owner of the Toys R Us trademark. Geoffrey then leased the Toys R Us trademark to stores operating in South Carolina, and in other states, for a royalty fee of 1% of the store's net sales. The Toys R Us stores then deducted the royalty fees they paid to Geoffrey from their taxable state income. The South Carolina Tax Commission responded to Toys R Us' tax filing by disallowing the deduction. The Commission then reversed its decision and allowed the deduction, but found that Geoffrey owed state income tax and a corporate license fee on the royalty income it received from the Toys R Us stores located in South Carolina. Geoffrey paid the taxes under protest and filed suit seeking *806 a refund, which was denied by the trial court.
On appeal, Geoffrey argued that it had not purposefully directed its activities towards South Carolina because it had no South Carolina stores when it initiated the License Agreements thus, the subsequent expansion into South Carolina was a unilateral business move that was incapable of creating the necessary "minimum contacts" to satisfy the Due Process Clause. Id. at 19, 437 S.E.2d 13. The court disagreed and ruled that Geoffrey consented to and benefitted from the use of its trademark in South Carolina. Id. at 19, 437 S.E.2d 13. Moreover, the court opined that Geoffrey controlled its contact with the state and could have prohibited the use of its trademark in South Carolina, as it had done in other states. Id. at 19, 437 S.E.2d 13.
Next, the court concluded that Geoffrey's intangible property located in the state satisfied Due Process requirements. The court referred to testimony by Geoffrey's Secretary, a Certified Public Accountant, that Toys R Us sales created an account receivable for Geoffrey. The court also noted that the trial court ruled that Geoffrey had a franchise in South Carolina, a ruling that Geoffrey failed to challenge. Id. at 20, 437 S.E.2d 13, also See n. 2.
The South Carolina supreme court affirmed the lower court and held that South Carolina could impose state income taxes against Geoffrey without offending the "minimum contacts" or the "nexus" requirements of the Due Process clause for two reasons: (1) Geoffrey purposely directed its business activities toward South Carolina's economic forum and (2) Geoffrey owned intangible property in the State.
The South Carolina supreme court also addressed the issue of whether or not South Carolina could tax Geoffrey's royalty income without violating the United States commerce clause. U.S.C. Const. Art. 1 § 8, cl. 3. The court asserted that a tax will survive challenge under the Commerce Clause so long as four factors are met: the tax is (1) applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the State. Id. at 23, 437 S.E.2d 13, citing Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977). Geoffrey argued that the "substantial nexus" factor was absent because it had no physical presence in South Carolina. The court disagreed and held that the taxpayer need not have a physical presence in the state to be subject to the state's tax jurisdiction. Id. at 23, 437 S.E.2d 13. Geoffrey, supra, also relied on Allied-Signal v. Comm'r of Finance, 79 N.Y.2d 73, 580 N.Y.S.2d 696, 588 N.E.2d 731 for the principles articulated in International Harvester, supra.[9] *807
*808 States have also invoked the principles in International Harvester, supra, to assert jurisdiction over pass-thru entities without violating the Due Process Clause. See, Borden Chemicals & Plastics, L.P. v. Zehnder, 312 Ill.App.3d 35, 244 Ill.Dec. 477, 726 N.E.2d 73 (2000), an Illinois Court of Appeals decision that upheld the tax liability of a nonresident limited corporate partner based on the in-state activities of the partnership and Kulick v. Department of Revenue, State of Oregon, 290 Or. 507, 624 P.2d 93, a Supreme Court of Oregon decision that affirmed the tax liability of nonresident shareholders in an S corporation.
Although states have asserted their rights to tax nonresident investors in partnerships and S corporations, there are no reported cases where a state has asserted their rights to tax nonresident investors in REITs. In Prentiss Wilson, Jr. And Mark Windfield-Hansen, State Taxation of Pass-Through Entities: General Principles, 419 PLI/TAX 1091, the authors speculate as to why REITs may have been treated differently as follows:
The reasons for the difference between the states' practice with respect to REITs in this regard and their practice with respect to S corporations and partnerships is not altogether clear. Presumably, the principal reason is that REITs do not directly pass through income to shareholders, in the manner that partnerships and S corporations do, but achieve the pass-through effect indirectly through dividends paid deduction. Id. at 1164.
Moreover, the authors comment as follows:
It is also possible that investors in REITs are viewed as more numerous and passive than partners in partnerships or S corporation shareholders typically are, although it is unlikely that REIT investors are less passive or numerous than limited partners in large public partnerships. Finally, it may simply be that states have not focused on the issue as yet and will assert jurisdiction to tax in the future. In any event, the constitutional precedents (discussed in 1500.11.A.1) (which are International Harvester, supra and Wisconsin v. J.C. Penney, supra), dealing with jurisdiction to tax nonresident corporate shareholders do not appear definitively to preclude the states from asserting jurisdiction to tax REIT investors. Id. at 1165.
In the present case, the Department asserts that International Harvester, supra, and similar cases, provide constitutional support for its tax assessment against Properties. The Department cites Wisconsin v. J.C. Penney, supra, for the proposition that a state's assertion of its *809 taxing power is immune from Due Process scrutiny where the state has asserted its power in relationship to opportunities which it has given, to protections which it has afforded under its police power, to benefits it has conferred by creating an orderly, safe climate to conduct business and earn income. According to the Department, there is no question that the state of Louisiana has afforded many protections and benefits in reference to the 68 retail stores. Further, the Department asserts that these "are obvious benefits of police protection, fire protection, street sanitation, etc. Thus, clearly nexus exists for jurisdiction purposes." Thus, the Department alleges that the issue then becomes "is that nexus broken because of the pass-through nature of the real estate investment trust?" The Department asserts that the answer is no, and that International Harvester, supra, supports their contention. The Department argues that "Properties owns 100% of Development. Development generates some $10 million of rental income from store locations (immovable property) located in the State of Louisiana. Louisiana extends protection and benefits to Development. International Harvester is authority for the exercise of jurisdiction under Louisiana's long-arm statute." We agree.
International Harvester, supra, stands for the proposition that a state may tax a nonresident shareholder's investment income based on its investment in a separate corporation engaging in business activities in the taxing state, when the state has provided benefits, opportunities, and protections which contributed to the profitability of the in-state activities. Since the taxing jurisdiction, Louisiana, has helped to create the income, it should not be prevented from assessing a constitutionally permissible share of those gains in the form of income taxes for the support of the government. Shaffer, supra, at 50-51, 40 S.Ct. 221.
Having found that Louisiana has jurisdiction in the present case, we need not address the third issue, the Department's assertion that Autozone Properties is the alter ego of Autozone Development. Additionally, since our holding only affirms Louisiana's constitutional jurisdiction and not Properties' tax liability, the Department's request for attorney's fees is premature.
Accordingly, the lower courts' judgments, which sustained Autozone Properties' declinatory exception of lack of personal jurisdiction, are reversed, and the case is remanded to the district court for further proceedings consistent with this opinion. REVERSED and REMANDED.
Rehearing not considered; not timely filed.
CALOGERO, C.J., Concurs in Denial of Rehearing:
I concur in the denial of the application for rehearing filed by defendant, Autozone Properties, Inc. ("Properties"), because the application was untimely, and the judgment is therefore final. However, I take the opportunity in response to this application to present the reasons why I concurred initially, the reasons I concur now, and my appreciation of the law governing this legal issue, especially since, while the judgment is now final in Louisiana, this matter concerns a serious federal constitutional issue, which, as between the litigants, is not yet finally resolved. I concurred in the opinion because the corporate restructuring undertaken by the various Autozone entities in 1995 seemed to me essentially to be a "scheme" designed to deprive the State of Louisiana of corporate income and franchise taxes it would otherwise have been entitled to receive. After reviewing the application for rehearing *810 and reassessing the appellate briefs, it has become apparent to me that this case involves a more serious constitutional issue than I had earlier perceived, one that might have been decided incorrectly by us on original hearing.
As the application for rehearing points out, because Properties responded to the State's suit with an exception to personal jurisdiction, the appeal in this case relates only to that issuepersonal jurisdiction. Further, applicable federal jurisprudence and/or rational legal analysis supports the possibility that the court of appeal might have correctly found that Louisiana courts do not have personal jurisdiction over this nonresident corporate shareholder whose only contact with Louisiana is its out-of-state receipt of dividends from a nonresident corporation of Louisiana that was doing business in Louisiana. It seems, at least, that the defendant may well lack sufficient minimum contacts with the State to support such jurisdiction. My clearest problem with the opinion is the court's statement, without qualification, that "Louisiana has personal jurisdiction over a nonresident shareholder when Louisiana has provided benefits, opportunities, and protections which helped to create the income." Bridges v. Autozone Properties, Inc., 04-0814, p. 2 (La.3/24/05), 900 So.2d 784, 787. That conclusion, and its underlying analysis, I submit, potentially expose untold numbers of out-of-state corporate shareholders to suits in Louisiana, regardless of whether those shareholders possess sufficient minimum contacts to support personal jurisdiction, contrary to a long line of state and federal jurisprudential authority.
In my view, the court's decision improperly conflates two issues that should be treated separately. The first of those issues focuses on whether a state has jurisdiction or authority to impose a given tax ("authority to tax"), while the second focuses on whether the prospective taxpayer has sufficient contacts with the state to allow that state's courts to exercise personal jurisdiction over that taxpayer in the state's suit to collect the tax ("Personal jurisdiction").[1] Because the word "jurisdiction" is often used in the case law to describe a state's authority to tax, these two separate, discrete issues are easily confused. However, I now believe that treating those two issues separately is essential to reaching a correct decision on the important constitutional issue presented in this case.
In the court's opinion in this case, the relevant issue was framed as follows:
whether Louisiana has taxing jurisdiction over the dividend income of a nonresident beneficiary, Autozone Properties, based on its investment in Autozone Development which receives the benefits, opportunities, and protections that come from doing business in Louisiana.
(Emphasis added.) In finding that Louisiana does have "taxing jurisdiction" over Properties, the court relies primarily on the following cases: International Harvester Co. v. Wisconsin Dept. of Taxation, 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944); Quill v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), and Geoffrey, Inc. v. South Carolina Tax Commission, 313 S.C. 15, 437 S.E.2d 13 (1993). All three of these cases focus on a state's authority to impose taxes, as opposed to a state court's personal jurisdiction over a nonresident defendant. The courts had personal jurisdiction in both International Harvester and Quill because the "minimum contacts" test was satisfied *811 by the fact that the defendants in the suits were nonresident corporations doing business within the state. In Geoffrey, personal jurisdiction was not an issue because the nonresident corporation had itself filed the suit, thereby submitting itself to the jurisdiction of the courts of South Carolina. Reduced to fundamentals, this court's decision in this case may be summarized as follows: If a state has authority to tax income derived from a corporation that has enjoyed benefits, opportunities, and protections provided by that state, the state's courts automatically have personal jurisdiction over nonresident shareholders who receive that income, even if those shareholders have no minimum contacts with the state. I do not believe that conclusion is consistent with the longstanding juris-prudential authority that requires minimum contacts to support a state court's personal jurisdiction over nonresident defendants.
Significantly, the analysis section of this court's decision does not cite any of the leading United States Supreme Court cases on personal jurisdiction, such as International Shoe v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), despite its acknowledgment that both of the lower courts relied on that case to support their findings that Louisiana courts do not have personal jurisdiction over Properties. International Shoe is instructive in a number of ways, not least of which is the fact that it is one of the seminal United States Supreme Court cases on personal jurisdiction. Further, it seems to me that consideration of the principles established by International Shoe is mandatory in this case because of the factual similarities. Like this case, International Shoe involves a state's effort to impose a tax on a nonresident corporation by filing a suit to which the nonresident corporation has responded by filing an exception to personal jurisdiction. Further International Shoe was decided by the United States Supreme Court just one year after it decided the International Harvester case setting forth the analysis for determining whether a state has authority to tax. These facts, taken together, raise the obvious question: If the International Harvester analysis relative to authority to tax is sufficient to decide the personal jurisdiction question in this case, as this court's opinion suggests, why did the United States Supreme Court employ the "minimum contacts" analysis to decide the personal jurisdiction issue in International Shoe?
Ultimately, I believe that International Shoe stands for the proposition that authority to tax and personal jurisdiction are discrete questions, both of which must be answered before a state can pursue collection of a tax against a nonresident prospective taxpayer by filing a suit in that state's courts. The separate nature of the two issues is clear in the introduction to International Shoe, in which the United States Supreme Court set forth two different "questions for decision" as follows:
(1) whether, within the limitations of the due process clause of the Fourteenth Amendment, appellant, a Delaware corporation, has by its, activities in the State of Washington rendered itself amenable to proceedings in the courts of that state to recover unpaid contributions to the state unemployment fund exacted by state statutes, . . . and (2) whether the state can exact those contributions consistently with the due process clause of the Fourteenth Amendment.
Id. at 311, 66 S.Ct. 154. Stated another way, question number one is the personal jurisdiction question, while question number *812 two is the authority to tax question.[2] The International Shoe court concluded that the State of Washington had both "constitutional power to lay the tax [i.e., authority to tax] and to subject appellant to suit to recover it [i.e., personal jurisdiction]." Id. at 321, 66 S.Ct. 154.
Further, the dicta in International Shoe and Quill to the effect that the question of a state's authority to impose a tax and the question of the state court's personal jurisdiction over the prospective nonresident taxpayer are sometimes decided on the basis of the same factual considerations, does not, in my view, give this court license to simply ignore the minimum contacts analysis when considering the personal jurisdiction question in tax cases. It seems logical to me that, whenever a nonresident prospective taxpayer has minimum contacts with a state, and these minimum contacts are related to its receipt of income from activities in the state, and these minimum contacts are sufficient to allow the state's courts to exercise personal jurisdiction over that taxpayer, the state probably also has authority to tax that income. In that case, some of the same factors that support the state court's personal jurisdiction would logically support the state's authority to tax. On the other hand, the converse is not necessarily true. The fact that a state has authority to tax income because it has provided benefits, opportunities, and protections that contributed to the profitability of the enterprise providing that income, does not necessarily mean that the nonresident prospective taxpayer, who receives dividend income derived from a corporation doing business in that state, has minimum contacts with the state sufficient to support personal jurisdiction over that taxpayer.
This conclusion is supported by the fact that, to my knowledge, no court has ever before held that a nonresident shareholder's simple receipt of dividends from a corporation doing business in the state constitutes sufficient minimum contacts to allow that state's courts to exercise personal jurisdiction over that nonresident shareholder, in the absence of any other contacts with the state. Although the International Harvester v. Wisconsin Dept. of Taxation case contains an extensive discussion of Wisconsin's authority to tax dividend income received by nonresident shareholders with no other contacts in Wisconsin, the critical difference between that case and this case is the fact that, in International Harvester, the nonresident shareholders were not named as defendants in the state's suit to collect the tax. 322 U.S. 435, 64 S.Ct. 1060. Rather, the defendant in the International Harvester suit was the corporation issuing the dividends to the nonresident shareholders. The defendant corporation was doing business in Wisconsin and therefore had minimum contacts with Wisconsin. Id. In the case here under consideration, the State's suit named the nonresident shareholder as a defendant, in fact the only defendant.
Nevertheless, it does seem offensive that the State of Louisiana might be deprived of the taxes it might otherwise be entitled to collect on Autozone Development's rental income, if that income were not distributed as dividends to Properties. The solution to that problem is not to allow Louisiana courts to exercise personal jurisdiction over nonresident shareholders who may have no minimum contacts with Louisiana. The court of appeal properly observed in this case that "the Department [of Revenue]'s remedy appears to lie *813 with the legislature." Bridges v. Autozone Properties, Inc., XXXX-XXXX (La.App. 1 Cir. 1/5/04), 873 So.2d 25, 32. Indeed, many states have adopted creative and thoughtful legislation to combat the problem of avoidance of state taxation through various corporate structuring schemes,[3] including the formation of Real Estate Investment Trusts ("REITs"), such as Autozone Development from which Properties receives the dividends the State wishes to tax in this case. Notably, Mississippi has adopted legislation specifically dealing with the problem of tax avoidance through formation of REITs. See Miss.Code Ann. § 27-7-17(n)of 1986. Texas and New Jersey have proposed somewhat similar provisions.[4]
Further, Louisiana has itself has adopted legislation to deal with the problem of taxing partnerships that do business in Louisiana and have nonresident partners. Louisiana specifically requires partnerships doing business in Louisiana to file returns and make payments on behalf of nonresident partners who do not agree to file returns in Louisiana and pay taxes on their Louisiana income. La. R.S. 47:201.1. Just as Louisiana has legislatively handled the problem of taxation of nonresident partners in a Louisiana partnership, a legislative solution would seem to be warranted to combat the problem of taxation of nonresident shareholders in REITs doing business in Louisiana. One legislative solution to this problem would be the adoption of legislation disallowing the dividends-paid deduction taken by the REIT in this case, thereby allowing Louisiana to tax the dividend income while it is in the hands of the REIT that clearly has minimum contacts with Louisiana through its ownership of property and receipt of rents from the retail Autozone stores operating within the State.
I concur in the denial of this untimely application for rehearing in order to express my belief that, had it been timely filed, the rehearing application should have been granted so as to allow the parties to brief and argue the issue of whether Properties had sufficient contacts with the State of Louisiana to allow Louisiana courts to exercise personal jurisdiction over that nonresident corporation in this suit by the State of Louisiana seeking payment of taxes. That issue is not resolved, in my view, by this court's finding that Louisiana has authority to levy the taxes against Properties because of its receipt of dividends from a separate company that enjoyed the benefits, opportunities, and protections that contributed to the profitability of that separate company. I believe that the applicable United States Supreme Court jurisprudence on this issue clearly reveals that the personal jurisdiction question is a separate question from the issue of whether the State of Louisiana has authority to tax the income of the corporation from which Properties receives dividends, and that the traditional minimum contacts test applies to resolution of the personal jurisdiction question. Further, assuming that the court of appeal correctly found that Autozone Properties does not have requisite minimum contacts with the State of Louisiana to allow Louisiana courts to exercise personal jurisdiction over that nonresident dividend recipient corporation, the taxes cannot be collected by resort to the method chosen by the State in this casei.e., the filing of suit *814 against the nonresident shareholder corporation.
In my view, the State, by enacting curative legislation, could collect the corporate taxes on the revenues from the in-state stores while avoiding the necessity of suing nonresident shareholders to collect the tax, if it were to pass legislation like Mississippi has whereby the taxes could be collected before the dividends from REITs leave the State.
NOTES
[1] A unitary business is one in which related businesses are so closely affiliated to each other that it would be improper to give them separate consideration or to treat them as independent units. Giles Sutton, Comparison of Group Reporting Methods and Sourcing of Income, 9 THE STATE AND LOCAL TAX LAWYER, 29, 37 (2004). Although the United States Supreme court has yet to render a rigid definition of a unitary business, it has identified some of the characteristics of unitary businesses: (1) unity of use and management, (2) a concrete relationship between the out-of-state and the in-state activities that is established by the existence of a unitary business, (3) functional integration, centralization of management, economies of scale, (4) substantial mutual interdependence, and (5) some sharing or exchange of value not capable of precise identification or measurement  beyond the mere flow of funds arising out of a passive investment or a distinct business operation. Michael J. McIntyre, Paull Mines & Richard D. Pomp, Designing a Combined Reporting Regime for a State Corporate Income Tax: A Case Study of Louisiana, 61 LA.L.REV. 699, 718. Under the unitary business principle, the income derived by a group of related corporations from the operation of the unitary business has nexus with all of the states in which that unitary business is conducted.
[2] A combined report is an accounting document prepared on behalf of a group of affiliated corporations engaged in a unitary business. McIntyre, Mines & Pomp, supra, at 712. According to Pomp and Oldman, supra, a "combined report would treat the parent and the subsidiary as if they were divisions of the same unitary business." Id. at 10-30. Intercorporate transactions between the affiliated entities "would be eliminated and the income reported on the books of the subsidiary would be added to the income reported on the books of the parent and modified pursuant to state law." Id. at 10-30. Conversely, Louisiana resembles what Pomp and Oldman, supra, refer to as separate entity reporting states. Pomp and Oldman comment as follows:

Separate entity states treat related corporations as if they were unrelated strangers. Because a stranger's income and factors would have no effect on another corporation's income and factors, the existence of the subsidiary has no bearing on calculating the parent's apportionable taxable income. Conversely, the income and factors of the parent would have no effect on calculating the subsidiary's apportionable taxable income. Id. at 10-30.
Unlike allocation and apportionment, the use of separate accounting has declined significantly. Pomp and Oldman, supra, at 10-7. Flaws in the separate accounting system have been noted by the United States Supreme Court and legal scholars. Citing Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942), the United States Supreme court in Mobil Oil, supra, noted that "separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale." Id. at 438, 100 S.Ct. 1223. Similarly, Justice Brennan writing for the court in Container, supra, commented as follows:
One way of deriving locally taxable income is on the basis of formal geographical or transactional accounting. The problem with this method is that formal accounting is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise. The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. Container, supra, at 164-165, 103 S.Ct. 2933.
[3] A pass-thru entity is defined by various sections of the Internal Revenue Code in the following ways:

26 USC § 1(h)(10)(A) a regulated investment company, (B) a real estate investment trust, (c) an S corporation, (D) a partnership, (E) an estate or trust, (F) a common trust fund, and (G) a qualified electing fund.
26 USC § 860E(6)(B)(I) any regulated investment company, real estate investment trust, or common trust fund, (ii) any partnership, trust, or estate, and (iii) any organization to which part I of subchapter T applies.
26 USC § 1201(d)(2)(A) a regulated investment company, (B) a real estate investment trust, (C) an electing small business corporation, (D) an estate or trust, and (F) a common trust fund.
26 USC § 1202(1)(g)(4)(A) any partnership, any S corporation, (C) any regulated investment company, and (D) any common trust fund.
26 USC § 1281(b)(2)(D) any partnership, S corporation, trust, or other pass-thru entity. 26 USC § 1260(c)(2)(A) a regulated investment company, (B) a real estate investment trust, (C) an S corporation, (D) a partnership, (E) a trust.
Partnerships and S corporations are the most commonly used and most widely discussed pass-through entities. In general, a partnership or S corporation does not pay federal tax on its income. Susan Kalinka, Louisiana Revised Statutes Section 47:201.1 and the Taxation of Nonresident Partners: An Alternate Proposal, 61 LA.L.REV. 805 (2001). Instead, each partner pays tax on its distributive share of partnership income and each shareholder pays tax on a pro rata share of the S corporation's income. Id. at 806. Similarly, a partnership is a pass-through entity in Louisiana for state income tax purposes. La. R.S. 47:201 provides as follows:
A partnership, as such, shall not be subject to the income tax imposed by this Chapter, but those partnerships having any member who is not an individual or who is not a resident of Louisiana shall be required to file a partnership return of income. Persons carrying on businesses as partners shall be liable for income tax only in their separate or individual capacities.
Likewise, for Louisiana state income tax purposes, the S corporation also passes through income to its shareholders. Kalinka, supra, at 817.
In addition to partnerships and S corporations, the Internal Revenue Code recognizes several other types of pass-thru entities including real estate investment trusts, such as Development. Mark J. Silverman, Steven B. Teplinsky & Aaron P. Nocjar, The S Corporation Rules and the Use of S Corporations as Acquisition, 624 PLI TAX 73, 221 (2004).
[4] The House Ways and Means Committee responsible for the legislation made the following points regarding the REIT's tax treatment:

1. This conduit treatment is desirable since the REIT constitutes a pooling arrangement whereby small investors can secure advantages  such as diversification of investments, spreading the risk of loss, obtaining the benefit of expert investment counsel and the financial means to handle projects of the size that could not be handled singly-normally available only to those with larger resources.
2. The committee felt it desirable to remove taxation, to the extent possible, as a factor in determining the relative size of investments in real estate equities and mortgages, thus encouraging the flow of private capital into such investments.
3. The statute has been carefully drawn so as to extend conduit tax treatment only to income from the passive investments of REITs (in contrast to the active operation of a real estate business).
4. Conduit tax treatment of REITs is justified because their situation is comparable to that of regulated investment companies. H.R.Rep. No.2020, 86th Cong., 2d Sess. 3-18 (1960).
[5] Person means an individual, a corporation, a partnership, an association, a joint stock company, a business trust, or two or more persons having a joint common interests. La. R.S. 9:1725(3). A settlor is the person who creates the trust. A person who subsequently transfers property to the trustee of an existing trust is not a settlor. La. R.S. 9:1761. A trustee is the person to whom title to the trust property is transferred to be administered by him as a fiduciary. La. R.S. 9:1781. Title to the property vests in the trustee. Reynolds v. Reynolds, 388 So.2d 1135, 1142 (La.1979).

There are two types of beneficiaries: an income beneficiary and a principal beneficiary. Income beneficiary means a beneficiary to whom income is payable, presently, conditionally, or in the future, or for whom it is accumulated, or who is entitled to the beneficial use of principal presently, conditionally, or in the future, for a time before its distribution. La. R.S. 9:1725(2), also See, La. R.S. 9:1961, et seq. A principal beneficiary is a beneficiary presently, conditionally, or ultimately entitled to principal. La. R.S. 9:1725(4), also See, La. R.S. 9:1971, et seq.
[6] The primary persons involved in the operation and maintenance of a corporation are its directors, officers, and shareholders. All of the corporations' powers shall be vested in, and the business and affairs of the corporation shall be managed by, a board of directors. La. R.S. 12:81. The board of directors shall elect a president, a secretary and a treasurer, and may elect one or more vice presidents. La. R.S. 12:82. A shareholder is the holder of record of one or more shares. La. R.S. 12:1(R). Shares are the units into which the shareholders' rights to participate in the control of the corporation, in its profits or in the distribution of corporate assets, are divided. La.R.S. 12:1(S).
[7] In Secretary v. Gap, the court held that Louisiana had taxing jurisdiction over a Delaware corporation because the company's intangible property had obtained a business situs in Louisiana. Also See, Susan Kalinka, Gap (Apparel) Strikes A Blow At Corporate Tax Shelters in Louisiana, 52 LA. B.J. 194 (October/November 2004).
[8] For the historical perspective, see Shaffer v. Carter, 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920), where the court upheld the constitutionality of a tax assessed by the state of Oklahoma against the income of an Illinois businessman, Charles B. Shaffer, who owned oil producing properties in Oklahoma. Shaffer argued that Oklahoma was without jurisdiction to tax his income since he resided in Illinois and managed his business from Illinois. The court rejected Shaffer's argument and reasoned that the very fact that a citizen could reside in one state but own property and conduct business in a separate state provided a reasonable basis for requiring citizens to pay taxes to the state where the income is created. Id. at 53, 40 S.Ct. 221. In making this determination, the court discussed the state's power to tax income created within its borders as well as the state's flexibility in crafting a constitutional method to extract the tax.

First, the court held that in our system of government, "the states have general dominion, and, saving as restricted by particular provisions of the federal Constitution, complete dominion over all persons, property, and business transactions within their borders." Id. at 49, 40 S.Ct. 221. The court also concluded that all reasonable forms of taxation are allowed in order to subsidize the state's expenses involved in "preserving and protecting all such persons, property, and business." Id. at 50, 40 S.Ct. 221. Citing McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, the court held that "(a)ll subjects over which the sovereign power of a state extends, are objects of taxation." Id. at 51, 40 S.Ct. 221. Further, the court acknowledged the state's taxing authority as follows:
That the state, from whose laws property and business and industry derive the protection and security without which production and gainful occupation would be impossible, is debarred from exacting a share of those gains in the form of income taxes for the support of the government, is a proposition wholly inconsistent with fundamental principles as to be refuted by its mere statement. That it may tax the land but not the crop, the tree but not the fruit, the mine or well but not the product, the business but not the profit derived from it, is wholly inadmissible. Id. at 50-51, 40 S.Ct. 221.
Next, the court cited Michigan Central Railroad v. Powers, 201 U.S. 245, 26 S.Ct. 459, 50 L.Ed. 744 (1906) for the proposition that "(t)here is no general supervision on the part of the nation over state taxation, and in respect to the latter the state has, speaking generally, the freedom of a sovereign both as to objects and methods." Id. at 51-52, 40 S.Ct. 221. Additionally, the court referred to State Tax on Foreign-Held Bonds, 82 U.S. (15 Wall.) 300, 319, 21 L.Ed. 179 (1872) which held that "(u)nless restrained by provisions of the federal Constitution, the power of the state as to the mode, form, and extent of taxation is unlimited, where the subjects to which it applies are within her jurisdiction." Id. at 52, 40 S.Ct. 221. On the same day that Shaffer, supra, was decided, the United States Supreme Court also decided Travis v. Yale & Towne Mfg. Co., 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920). In Travis, the court affirmed the constitutional right of the state of New York to tax Connecticut and New Jersey residents on the income they earned while working in New York. Relying on its decision in Shaffer, supra, the court concluded as follows:
That the State of New York has jurisdiction to impose a tax of this kind upon the incomes of nonresidents arising from any business, trade, profession, or occupation carried on within its borders, enforcing payment so far as it can by the exercise of a just control over persons and property within the state, as by garnishment of credits (of which the withholding provision of the New York law is the practical equivalent), and that such a tax, so enforced does not violate the due process of law provision of the Fourteenth Amendment, is settled by our decision in Shaffer. Id. at 74, 40 S.Ct. 228.
The court extended its analysis to intangible property in People of State of New York ex rel. Whitney v. Graves, 299 U.S. 366, 57 S.Ct. 237, 81 L.Ed. 285 (1937). In Whitney, the court affirmed the state of New York's right to tax a Massachusetts resident on the income he earned from the sale of his membership right on the New York Stock Exchange without violating the Due Process Clause.
The taxpayer, C. Handasyde Whitney, was a resident of Massachusetts who was a partner in a Boston securities firm. Whitney, a member of the New York Stock Exchange (hereinafter NYSE), became entitled to an additional one-fourth membership due to an increase in the overall number of NYSE members.
Whitney sold his new membership right for $108,000 and was subsequently assessed a tax on these earnings by the Tax Commissioner of New York. Whitney protested the tax assessment to no avail. He then appealed to the Appellate Division who sustained the Tax Commissioner's assessment. Id. at 369, 57 S.Ct. 237. Subsequently, Whitney appealed to the United States Supreme Court. Id. at 370, 57 S.Ct. 237. In challenging New York's jurisdiction to extract the tax, Whitney made three main arguments. First, he argued that he and his business partners were domiciled in Massachusetts and had never lived, worked, or carried on business in New York. Id. at 371, 57 S.Ct. 237. Second, he asserted that although he and his business partners advertise themselves in Boston as members of the NYSE and accept orders in their Boston office for transactions at the NYSE, none of that business is conducted by either he or his business partners in New York. Id. Lastly, he claimed that those securities orders that required execution in New York were handled by NYSE member firms who had business offices in New York and who execute their orders on the NYSE "in their own names." Id.
The court rejected Whitney's arguments and held that Whitney's intangible property, his membership right in the NYSE, had obtained a "business situs" in New York which gave the state of New York taxing jurisdiction. Id. at 373, 57 S.Ct. 237. According to the court, the NYSE was a marketplace for the buying and selling of securities. Id. Membership entailed the privilege of participating in that marketplace. The actual buying and selling of securities could only be transacted on the floor of the NYSE in the state of New York. The court concluded that the chief characteristic of the membership right was so connected to the physical site of the NYSE as to bring ownership, including the sale, of that right within the jurisdiction of New York. Id. at 373, 57 S.Ct. 237.
Following these decisions, the United States Supreme Court delivered its most far-reaching, and controversial, affirmations of a state's jurisdiction to tax the dividend income of a nonresident shareholder based upon the benefits, opportunities, and protections provided by the state in creating the dividend income.
In State of Wisconsin v. J.C. Penney, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940), the court held that a Wisconsin Privilege Dividend tax extracted from the dividend income of nonresident shareholders did not run afoul of the 14th amendment's Due Process requirements.
J.C. Penney was a Delaware corporation with its principal place of business in New York. Its shareholder meetings were held in New York where its dividends were declared. The dividend checks were issued to the shareholders from New York banks. Thus, the declaration and distribution of dividends to the corporation's shareholders occurred outside of Wisconsin.
The Wisconsin Supreme Court held that the tax violated the Due Process requirements since the state sought to tax a dividend-payment process that occurred outside of Wisconsin's borders. However, the United States Supreme Court reversed and remanded. Id. at 446, 61 S.Ct. 246.
The issue before the court was whether the Wisconsin tax could be imposed on a nonresident corporation, J.C. Penney, that was doing business in the state of Wisconsin, without offending the Due Process Clause. The Wisconsin statute provided, in pertinent part, as follows:
For the privilege of declaring and receiving dividends, out of income derived from property located and business transacted in this state, there is hereby imposed a tax equal to two and one-half per centum of the amount of such dividends declared and paid by all corporations (foreign and local) ... Every corporation hereby made liable for such tax, shall deduct the amount of such tax from the dividends so declared. Id. at 441, n. 1, 61 S.Ct. 246.
The court interpreted the practical effect of the tax as being an additional tax on the corporation's Wisconsin earnings and a postponement of the tax until the dividends were distributed. Id. at 442, 61 S.Ct. 246. The court supported its conclusion with two main pronouncements regarding a state's taxing power over nonresidents.
First, the court emphasized the need to give the states the power and flexibility to tax income earned within their borders so as not to restrict the states' ability to address their fiscal responsibilities. The court held as follows:
The Constitution is not a formulary. It does not demand of states strict observance of rigid categories nor precision of technical phrasing in their exercise of their most basic power of government, that of taxation. For constitutional purposes the decisive issue turns on the operating incidence of a challenged tax. A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society. Id. at 444, 61 S.Ct. 246.
Second, the court opined that the authority for a state to tax a nonresident was not dependent on terminology attendant to a particular tax but was grounded in the fundamental, Constitutional authority of a state to tax income created within its borders based upon the benefits, opportunities, and protections the state has provided. To this end, the court held as follows:
Constitutional provisions are often so glossed over with commentary that imperceptibly we tend to construe the commentary rather than the text. We cannot, however, be too often reminded that the limits on the otherwise autonomous powers of the states are those in the Constitution and not verbal weapons imported into it. `Taxable event', `jurisdiction to tax', `business situs', `extraterritoriality', are all compendious ways of implying the impotence of state power because state power has nothing on which to operate. These tags are not instruments of adjudication but statements of result in applying the sole constitutional test for a case like the present one. Id. at 444, 61 S.Ct. 246.
Thus, the court held that in determining whether a tax on a nonresident shareholder violates the Due Process Clause, the "test is whether property was taken without due process of law, or if paraphrase we must whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." (Emphasis added) Id. at 444, 61 S.Ct. 246.
The court concluded that the taxing power did bear fiscal relation to benefits, opportunities, and protections provided by Wisconsin. Thus, Wisconsin had given something for which it could ask return, mainly, the substantial privilege of conducting business in the state of Wisconsin and the subsequent profits derived therefrom. Id. at 445, 61 S.Ct. 246. That the dividend income, which originated in Wisconsin, was declared and distributed outside of Wisconsin failed to defeat Wisconsin's taxing jurisdiction. According to the court, the "fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction." Id. at 445, 61 S.Ct. 246.
[9] Specifically, the Geoffrey, supra, court, ruled that "(t)he real source of Geoffrey's income is not a paper agreement, but South Carolina's Toys R Us customers ... By providing an orderly society in which Toys R Us conducts business, South Carolina has made it possible for Geoffrey to earn income pursuant to the royalty agreement." Geoffrey, 313 S.C. 15 at 22, 437 S.E.2d 13. (Emphasis added).

Legal scholars offer mixed interpretations of International Harvester, supra. For example, in John A. Swain, State Income Tax Jurisdiction: A Jurisprudential & Policy Perspective, 45 WM. & MARY L.REV. 319 (2003), the author asserts that International Harvester's strength as an authority for state income tax jurisdiction based on economic presence alone is weakened by the fact that the opinion fails to state that Wisconsin has jurisdiction over the nonresident shareholders and not merely jurisdiction over their income. Id. at 350. Additionally, Swain, supra, points out that the court specifically referred to the constitutionality of the withholding of the tax by International Harvester, an entity with a physical presence within the state. Id. at 350. Conversely, in Hellerstein & Hellerstein, State Taxation, 6.04(1) (3d ed. 2000)(2004 Cum.Supp. No.2, Vol. I), the authors comment as follows:
(T)here is no denying the fact that the Court's opinion in International Harvester lends powerful support to those who argue that a state has constitutional power to impose a tax on a nonresident based solely on the fact that the source of the nonresident's income is derived from activities conducted in the state, regardless of whether the nonresident has any physical presence in the state.
The 1991 Court of Appeals of New York decision in Allied-Signal v. Comm'r of Finance, supra, is an example of a court applying the principles of International Harvester, supra. In Allied-Signal, the court upheld a New York City tax against a nonresident corporation, Allied-Signal/Bendix, based upon its investment in an unaffiliated corporation that was doing business in New York, ASARCO, who subsequently distributed dividend income to Allied-Signal/Bendix, outside of New York City. (In the late 1970s, Bendix Corporation acquired ASARCO common stock. Allied-Signal Inc. was Bendix's successor in interest. Allied-Signal, 580 N.Y.S.2d at 698-699, 588 N.E.2d 731. Allied-Signal/Bendix is used for uniformity.)
Allied-Signal/Bendix, a Deleware manufacturing company with its principal place of business in Michigan acquired 20.6% of the outstanding shares of common stock of ASARCO, a New Jersey mining corporation with its commercial domicile in New York city. Subsequently, Allied-Signal/Bendix received dividend income at its Michigan headquarters from its ASARCO investment. Allied-Signal/Bendix failed to include any of this dividend income in its New York corporate tax return. Following an audit, the New York City Department of Finance filed a deficiency notice assessing Allied-Signal/Bendix taxes for $96,540.
On appeal, Allied-Signal/Bendix argued that New York City was without jurisdiction to tax the dividend income it received from ASARCO because the City could not tax the income a nonresident corporation receives from its investment in another corporation, even if that corporation does business within the city, in the absence of a unitary business relationship between the two companies, which admittedly was absent here. Id. at 699, 588 N.E.2d 731. The court disagreed.
The issue before the court was whether "the business activities conducted in New York City by ASARCOthe corporation which generated Allied-Signal/Bendix's investment incomemay provide the requisite nexus for the City's imposition of a tax portion on that income." Citing Wisconsin v. Penney, supra, the court held that the test for determining whether a sufficient nexus exists between a taxing jurisdiction and the income it seeks to tax is whether the taxing power exerted bears fiscal relation to the protection, benefits, and opportunities provided by the state. Allied-Signal, 580 N.Y.S.2d at 701, 588 N.E.2d 731. More succinctly, the court concluded that the "simple but controlling question is whether the state has given anything for which it can ask return." Id.
The court held that the city of New York had given something it could ask return, and premised this determination on the nonresident shareholder, Allied-Signal/Bendix's, investment in ASARCO. The court concluded as follows:
Here, it is undisputed that New York City has afforded privileges and opportunities to ASARCO. That these privileges and opportunities have contributed to ASARCO's capital appreciation and thus also inured to the benefit of all its shareholders, including Bendix, is also beyond question. Thus, we agree with the City that it has given Bendix something `for which it can ask return,' and that consequently a sufficient nexus existed to support the City's tax. Id. at 701, 588 N.E.2d 731.
The court held that no other conclusion could be reached in light of International Harvester, supra, since, as the court noted, both Allied-Signal and International Harvester, supra, were both premised on the constitutionality of taxing a nonresident shareholderthe dividend-payeebased on the presence of the corporation that generated the investment incomethe dividend-payorwithin the taxing jurisdiction. Allied-Signal, 580 N.Y.S.2d at 702, 588 N.E.2d 731. The court concluded by citing International Harvester, supra, for the proposition that the "in-State activities of the corporation which generated the investment income sought to be taxed `fairly measured the benefits that (the taxpayer-shareholders) derived from these (in-State) activities.'" Allied-Signal, 580 N.Y.S.2d at 703, 588 N.E.2d 731.
In his dissent, Judge Hancock noted that rather than basing its decision on the benefits, protections, and opportunities the city provided to Allied-Signal/Bendix, the entity it sought to tax, the majority established its taxing nexus over the nonresident shareholder, Allied-Signal/Bendix, solely on its stock ownership in ASARCO. Judge Hancock's dissent also suggests a different interpretation of International Harvester, supra. Judge Hancock concludes that in International Harvester, supra, the United States Supreme Court held that the tax burden placed on the shareholders did not "amount to a separate direct tax on them and that, if it were so viewed, it would be unconstitutional for lack of nexus." Allied-Signal, 580 N.Y.S.2d at 714, 588 N.E.2d 731.
[1] See Walter Hellerstein, "Jurisdiction to Tax Income and Consumption in the New Economy: A Theoretical and Comparative Perspective," 38 Ga. L.Rev. 1, 3-4 (Fall 2003).
[2] As this quote demonstrates, due process concerns impact both the personal jurisdiction issue and the authority to tax issue.
[3] For a general overview of this legislation, see Ann L. Kamasky & Michael A. Guariglia, The States Strike Back  New Legislation and Rules Limit Common State Income Tax Planning Strategies, 2003 WL 2202135, George-town University Law Center Continuing Legal Education.
[4] See, id.